*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

BRETT ROBERTS

    Plaintiff,

v.

CHIEF EDWARD ZIOLKOWSKI, Individually and in his official capacity, DELAWARE TOWNSHIP POLICE DEPARTMENT, TOWNSHIP OF DELAWARE, DETECTIVE ROBIN MORANTE, Individually and in her official capacity, ASSISTANT PROSECUTOR DAWN SOLARI, Individually and In her official capacity, ACTING HUNTERTDON COUNTY PROSECUTOR DERMOT O'GRADY, Individually and in his official capacity, DETECTIVE SERGEANT KRISTEN LARSEN, Individually and in her official capacity, LIEUTENANT KATHLEEN SHIVE, Individually and in her official capacity, ASSISTANT PROSECUTOR CHRISTINE OLEXA, Individually and in her official capacity, HUNTERDON COUNTY PROSECUTOR'S OFFICE, COUNTY OF HUNTERDON, JANE DOE 1-10, Individually and, if applicable, in their official Capacity (Fictitious Names), JOHN DOE 1-10, Individually and, if applicable, in their official capacity (Fictitious Names),

    Defendants.

Civ. Action No.: 12-4763 (FLW)

OPINION

---

## WOLFSON, United States District Judge:

Presently before the Court is a motion to dismiss filed by defendants, Chief Edward Ziolkowski ("Chief Ziolkowski"), Delaware Township Police Department ("the Police Department"), and Delaware Township ("the Township") (collectively, the "Moving

Defendants"). The instant case arises out of the arrest and prosecution of pro se plaintiff Brett Roberts ("Roberts" or "Plaintiff") for alleged threats made to his neighbor's daughter. After the eventual dismissal of the criminal charges against Roberts, Plaintiff filed his complaint in state court against all defendants, including the Moving Defendants, asserting common law claims of false arrest and malicious prosecution, violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 et seq., and violations of 42 U.S.C. § 1983. That complaint was removed by defendants to this Court. After removal, the Moving Defendants filed the instant motion to dismiss Plaintiffs' claims against them. For the reasons that follow, the Court **GRANTS** the Moving Defendants' motion.[1]

I.   **Background**

The Court recounts facts as they are alleged in the Amended Complaint. Roberts and his neighbors, the Herdman family, have a tumultuous history. Since May 2000, the parties have engaged in numerous, often heated disputes concerning an easement across the Herdman's property, which Roberts uses to access his home. See Compl., ¶¶ 24-29. Over the years, the Police Department and Chief Ziolkowsi were called upon numerous times to resolve the disputes, but to no avail. Id. On June 12, 2010, an incident occurred between Roberts and Mrs. Herdman as Roberts walked down the easement to his mailbox. Id., ¶ 30. According to Plaintiff,

---

[1] Plaintiff also asks this Court to vacate an Order dated October 12, 2012, issued by the State Court. According to Plaintiff, after the removal of this case by one or more non-moving defendants from State Court in July 2012, the Moving Defendants filed a motion to dismiss the state proceedings, which was erroneously granted by the State Court. Plaintiff argues that the State Court did not have jurisdiction at that time over his Complaint since the case was already removed. Plaintiff's arguments are moot, however. No matter what occurred in State Court with respect to the Moving Defendants' motion to dismiss, the Moving Defendants are, again, moving to dismiss Plaintiff's Amended Complaint in this case. As such, any State Court order in that regard will have no effect on this Court's determination in this matter. Plaintiff's request is denied as moot.

Mrs. Herdman yelled at Roberts and Roberts retorted; the back-and-forth between Mrs. Herdman and Roberts attracted the attention of a neighbor, Daniel Horner ("Horner"), who purportedly witnessed the altercation. Id., ¶ 31. Shortly after the incident transpired, Mrs. Herdman called the police, claiming that Roberts threatened to kill her young daughter ("A.H.") with a hammer. Id., ¶ 32.

In response to Mrs. Herdman's phone call, Chief Ziolkowski was sent to investigate the matter. Id. According to Roberts, he was performing maintenance on the easement when Chief Ziolkowski's arrived. Id. Chief Ziolkowski approached Roberts and asked him if he was in possession of a hammer. After a brief survey, Chief Ziolkowski was satisfied that Roberts did not have a hammer, and informed him of Mrs. Herdman's allegations. Id. Roberts then pointed to a surveillance camera mounted on the back of the Herdman's residence, which he claimed would exonerate him of any alleged criminal behavior. Id. Plaintiff maintains that Chief Ziolkowski made no attempt to secure the surveillance footage. Id., ¶ 33. After speaking with Roberts, Chief Ziolkowski interviewed Mrs. Herdman, A.H., and Horner.[2] See Investigative Report dated June 12, 2012. Significantly, Horner corroborated Mrs. Herdman's and A.H.'s claims that Roberts threatened to kill A.H. Id. Thus, following protocol, Chief Ziolkowski called the Hunterdon County Prosecutors Office ("Prosecutor Office") for assistance in conducting a follow up investigation. Id.

To assist Chief Ziolkowski, the HCPO sent Detective Morante to the Police Department to be briefed. There, Detective Morante learned about the alleged incident and the history

---

[2] In his Amended Complaint, Plaintiff refers to, inter alia, Chief Ziolkowski's Investigative Report and the Affidavit of Probable Cause. As such, because those documents are integral to the Amended Complaint, on a motion to dismiss, I may rely on them. See In re Rockefeller Center Properties, Inc. Securities Litig., 184 F.3d 280, 287 (3d Cir. 1999); West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 97 (3d Cir. 2010). Indeed, Plaintiff attaches those documents to his opposition brief as exhibits.

between the parties. Detective Morante and Chief Ziolkowski then conducted a follow up investigation. The investigation report details the statements of A.H., A.H.'s brother, Mr. Herdman, Mrs. Herdman, and Horner. Significantly, the two eye witnesses, A.H. and Horner, stated that Roberts threatened to kill A.H. with a hammer. Id. However, while A.H. claimed that Roberts was holding a hammer and raised his arm in a threatening manner, Horner did not see a hammer at the time he observed the altercation. Id.; see Aff. of Probable Cause, p. 2. With respect to Mrs. Herdman and Jake Herdman, they both stated they did not directly hear the alleged threat, but that subsequent to the exchange, A.H. ran into the house crying and exclaimed that Roberts was going to kill her. Id. Lastly, Mr. Herdman stated he was not a witness to the incident, but that A.H. told him of Roberts' threat. Id.

As a result of his investigation, Chief Ziolkowski prepared an Affidavit of Probable Cause, which included the witness statements, but omitted any reference to the surveillance tape. Deeming the information sufficient, the Honorable John Petronko, J.S.C., issued an arrest warrant for Roberts based upon one count of third degree terroristic threats and two counts of harassment. See Aff. of Probable Cause.

In accordance with the Affidavit, Roberts was arrested at his home on June 12, 2010. After Roberts was released on bail, he contacted the Police Department to request that an investigator secure a copy of the Herdmans' surveillance video from June 12, 2010. Upon receipt of the video, Detective Morante prepared a supplementary investigation report, in which she noted the following: (1) A.H. could not be seen in the video; (2) it was unclear what kind of object Roberts was holding; and (3) Roberts did not appear to raise the object over his shoulder in a manner consistent with a strike. See HCPO Investigator Morante's Supplementary Report.

4

Roberts was subsequently indicted by the Hunterdon County Grand Jury on September 16, 2010, on one count of third degree terroristic threats, one count of third degree possession of a weapon for unlawful purpose in violation of N.J.S.A. 2C:39-4d, and one count of fourth degree unlawful possession of a weapon in violation of N.JS.A. 2C:39-5d. See Compl., ¶38. Those charges were subsequently dismissed on July 8, 2011 by the prosecutor. In addition, Roberts had been charged in a complaint with harassment, a petty disorderly persons offense, and that charge was remanded to the Municipal Court for resolution. Based on the record before the Court, the harassment charge is still pending.

In the instant Amended Complaint, Plaintiff asserts the following causes of action: (1) common law malicious prosecution; (2) common law false arrest; (3) violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 et seq; and (4) violations of 42 U.S.C. § 1983. It appears those claims are asserted against all defendants, and thus, on this motion to dismiss, the Court will address each claim as it pertains only to the Moving Defendants.

## II.  Discussion

### A. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the Supreme Court clarified the 12(b)(6) standard. The Court held that the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965. In affirming that Twombly standards apply to all motions to dismiss, the Supreme Court

has explained that principle. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948-49 (2009). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1949. Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). Moreover, in deciding a motion to dismiss, the Court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of Plaintiffs' claim. Lum v. Bank of Am., 361 F.3d 217, 222 n. 3 (3d Cir. 2004).

The Third Circuit has reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." West Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010). This means that, "[f]or example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." Id. That said, the Rule 8 pleading standard is to be applied "with the same level of rigor in all civil actions." Id. (citations and quotations omitted).

### B. Counts I and II – State Tort Claims

In Counts I and II of the Amended Complaint, Roberts asserts state tort claims of false arrest and malicious prosecution, respectively. Under New Jersey law, tort actions against public

entities[3] and public employees[4] are governed by the New Jersey Tort Claims Act ("T.C.A."), N.J.S.A. 59:1-1 et seq. The T.C.A. requires persons who have claims against public entities or their employees to provide notice to the parties within ninety days of accrual of such claims. N.J.S.A 59:8-8.[5] Importantly, failure to satisfy the notice requirement of the T.C.A. is an absolute bar to recovery against a public entity or its employees. N.J.S.A. 59:8-9.

In determining whether notice under N.J.S.A. 59:8-8 has been timely filed, "a sequential analysis must be undertaken." Beauchamp v. Amedio, 164 N.J. 111, 118 (2000). First, it must be determined when the claim accrued. Id. For false arrest, the accrual date "arises at the time the incident occurs, i.e., the time of arrest." Bauer v. Borough of Cliffside Park, 225 N.J. Super. 38, 47 (App. Div.), cert. denied, 113 N.J. 330, 550 (1988). For malicious prosecution, the accrual date arises at termination of the criminal proceeding in favor of the accused. Freeman v. State, 347 N.J. Super. 11, 26 (App. Div. 2002). Next, it must be determined whether a notice of claim was filed within ninety days. Beauchamp, 164 N.J. at 118. If not, it must be determined whether extraordinary circumstances justify the late notice. Id. at 118-19.

---

[3]   "Public entity" is defined as the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State. N.J.S.A. 59:1-3.

[4]   "Public employee" is defined as "an employee of a public entity." Id.

[5]   The notice must provide the name and address of the claimant, date, place, and circumstances of the occurrence or transaction giving rise to the claim asserted, a general description of the injury, damage or loss incurred, the name of the public entities or employees causing the injury, damage or loss and the amount of damages claimed. See N.J.S.A. 59:8-3.

In the instant case, there is no dispute that Roberts was arrested on June 12, 2010, and the complaint against him was administratively dismissed[6] on July 8, 2011. To this date, Roberts has not filed a tort claim notice under N.J.S.A. 59:8-8, nor has he alleged, here, any extraordinary circumstances in connection with his failure to do so.[7] Thus, Roberts failed to satisfy the T.C.A.'s notice provision within ninety days. Despite these statutory requirements, Roberts argues that two provisions in the T.C.A. make the notice requirement immaterial. First, he notes that a public employee is not immune under the T.C.A. if he or she engaged in conduct that "constituted a crime, actual fraud, actual malice or willful misconduct," N.J.S.A. 59:3-14. Second, he points to the language of N.J.S.A. 59:3-3, which states that "nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." N.J.S.A. 59:3-3. However, Roberts' reliance on these provisions is inapposite. Those provisions must be read together with the overall mandate of N.J.S.A. 59:8-3, which states that "no action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J.S.A. 59:8-3. In that connection, the New Jersey Supreme Court has clearly stated that no provision in the T.C.A. obviates the need to comply with the notice requirement. See Velez v. City of Jersey City, 180 N.J. 284, 294 (2002). Thus, Roberts' claims for false arrest and malicious prosecution cannot proceed, as his failure to satisfy the T.C.A.'s notice provision

---

[6]   In Rubin v. Nowak, 248 N.J. Super. 80, 83 (App. Div. 1991), the court held that an administrative dismissal of a criminal charge constitutes a favorable termination of a criminal proceeding for the purpose of an action for malicious prosecution.

[7]   To be sure, it does not appear that Plaintiff has filed a late notice of claim pursuant to N.J.S.A. 59:8-9.

8

amounts to "an absolute bar from recovery." N.J.S.A. 59:8-9. Accordingly, the Court dismisses Count I and II of Roberts' Amended Complaint against the Moving Defendants.[8]

### C. Counts III and IV– New Jersey Civil Rights Act and 42 U.S.C. § 1983

In addition to common law tort claims, Roberts further alleges that the Moving Defendants violated his civil rights under the New Jersey Civil Rights Act (the "C.R.A."), N.J.S.A. 10:6-1 et seq., and 42 U.S.C. § 1983. The C.R.A. allows a party who has been deprived of any rights under either the Federal or State Constitutions by a person acting under color of law to bring a civil action for damages and injunctive relief. See N.J.S.A. 10:6-1.[9] Similar to the C.R.A., § 1983 provides that any person who under color of law "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. Because the analysis for the claims against Chief Ziolkowski is different than for the claims against the Township and the Police Department, the Court discusses them separately below.

#### 1. Chief Ziolkowski

Roberts contends Chief Ziolkowski lacked probable cause for arrest, ignored exculpatory evidence, failed to conduct a sufficient investigation, and engaged in malicious prosecution in

---

[8] The Court notes that because the record is unclear as to Chief Ziolkowski's role in the pending Municipal Court proceeding or whether that proceeding has concluded, the Court's ruling on Plaintiff's failure to observe the T.C.A.'s notice requirement does not apply to Plaintiff's claims pertaining to the malicious prosecution of the Municipal Court proceeding against Chief Ziolkowski. Nevertheless, whatever the outcome of that proceeding, Chief Ziolkowski may be entitled to qualified immunity. See, infra. However, because Plaintiff's Amended Complaint is devoid of any facts as to Chief Ziolkowski's role, to the extent Plaintiff asserts a claim against him in this context, his claim is dismissed without prejudice.

[9] Notably, the procedural requirements and immunities of the T.C.A. are inapplicable to claims under the C.R.A. The C.R.A.'s sole procedural component is found in N.J.S.A. 10:6-2(d), which provides that C.R.A. actions "may be filed in Superior Court," and directs a court to hold a jury trial "upon application of any party." N.J.S.A. 10:6-2(d).

violation of his Fourth, Fifth, and Fourteenth Amendment rights under the State and Federal Constitutions. Because the Court finds that Chief Ziolkowski is entitled to qualified immunity, Roberts' C.R.A. and § 1983 claims are addressed in tandem. See Ramos v. Flowers, 429 N.J. Super. 13, 22-24 (App. Div. 2012) (holding the defense of qualified immunity is available under the C.R.A. and the standards governing the defense are the same as in actions brought under § 1983); Williams v. State Div. of State Police, No. 10-3478, 2012 U.S. Dist. LEXIS 72457, at *48 (D.N.J. May 24, 2012) (finding that "the defense of qualified immunity is appropriate to claims arising under the NJCRA, based on the history of NJCRA and the Court's prior decisions applying the defense as an extension of a § 1983 analysis"). In that connection, both federal and state laws dictate that the issue of qualified immunity should be decided as early in the proceedings as possible. See Saucier v. Katz, 533 U.S. 194, 200 (2001) (holding that a ruling on qualified immunity should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive); Wildoner v. Borough of Ramsey, 162 N.J. 375, 386-387 (2000) (holding a defendant's "entitlement to qualified immunity is a question of law to be decided early in the proceedings as possible, preferably on a properly supported motion for summary judgment or dismissal"). Accordingly, on this motion to dismiss, it is appropriate for the Court to engage in an analysis of qualified immunity.

The doctrine of qualified immunity provides that police officers, such as Chief Ziolkowski, may be shielded from liability in a civil rights suit if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; Ramos, 429 N.J. Super. at 27. Consequently, the qualified

immunity standard is one of "objective legal reasonableness." Harlow, 457 U.S. at 818.[10] The protection of qualified immunity exists "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231, (2009) (citation omitted). To determine whether a government official is entitled to qualified immunity, a court applies either or both of the two prongs of analysis outlined in Saucier, using the flexible approach endorsed in Pearson. Id. at 228. One prong asks whether "taken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201. The other prong asks "whether the right was 'clearly established' at the time of defendant's alleged misconduct." Id. In other words, "qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." Pearson, 555 U.S. at 232 (citation omitted). In that regard, the Court will conduct its analysis under the first prong of the Saucier test to determine whether Roberts' rights were infringed.

First, Roberts alleges that Chief Ziolkowski violated his Fourth Amendment rights by falsely arresting him, and subsequently prosecuted him maliciously. In order to establish these claims, Roberts must first demonstrate that Chief Ziolkowski lacked probable cause. See Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995). (stating that the Fourth Amendment only prohibits arrest and prosecution in the absence of probable cause). Probable cause exists if at the time of the arrest "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379

---

[10] In Kirk v. City of Newark, 109 N.J. 173 (1988), the New Jersey Supreme Court adopted the Harlow "objective reasonableness" standard for determining whether law enforcement officials are entitled to qualified immunity.

U.S. 89, 91 (1964) (citation omitted); see also State v. Waltz, 61 N.J. 83, 87 (1972) (describing probable cause as a "well-grounded" suspicion that a crime has been or is being committed). Here, Chief Ziolkowski had sufficient evidence to establish probable cause. Significantly, the warrant recounts the statements of A.H., the victim of the alleged crime, and Horner, an eye witness, who both told Chief Ziolkowski that Roberts had threatened to kill A.H. with a hammer. Indeed, "when a police officer has received a reliable identification by a victim . . . the police have probable cause." Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1993); Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991) (stating that "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification . . . provided by a victim"). In addition, Mrs. Herdman informed the investigators that A.H. ran back into the house hysterically crying and told her that Roberts threatened her verbally and physically with a hammer. The combination of these witnesses' statements supports the reasonable belief that Roberts had threatened A.H, which gave rise to probable cause. Certainly, Chief Ziolkowski had sufficient probably cause, based on the totality of the witnesses' statements, with respect to the alleged "verbal" threat against A.H. Furthermore, Chief Ziolkowski's reasonable belief was buttressed by the assistance of Detective Morante, who also interviewed the witnesses and came to the same "well-grounded" suspicion that a crime had been committed. State v. Waltz, 61 N.J. at 83. Although Roberts accuses the witnesses of conspiring against him in an attempt to attack their veracity, the relevant inquiry for probable cause is the facts and circumstances known to Chief Ziolkowski at the time of the arrest. In that respect, Roberts does not allege Chief Ziolkowsi was aware of the alleged conspiracy, or that he was a part of a conspiracy, nor does Chief Ziolkowski was under a duty to uncover such a conspiracy in his initial investigation. Accordingly, giving all reasonable inferences to the facts alleged by Roberts, the Court finds that

probable cause existed, and therefore, Chief Ziolkowski did not violate Roberts' constitutional rights. Chief Ziolkowski is entitled to qualified immunity.

Roberts nonetheless argues that he can prevail because Chief Ziolkowski knowingly, or recklessly, failed to disclose the video surveillance tape in his affidavit of probable cause; hence, the probable cause determination was artificial. In Wilson v. Russo, 212 F.3d 781 (3d. Cir. 2000), the Third Circuit has articulated the standard for this type of claim. In order for Roberts to succeed, he must demonstrate that Chief Ziolkowski recklessly omitted or "recklessly disregarded the truth in [his] warrant application *and* that a warrant application based on what [he] should have told the judge would have lacked probable cause." Id. at 786. In that respect, an omission is made with reckless disregard for the truth if "an officer recklessly omits facts that any reasonable person would know that a judge would want to know." Id. at 783 (citation omitted). However, an officer is not required to "relate the entire history of events leading up to a warrant application with every potentially evocative detail." Id. at 787. Further, to determine whether the omissions were material, a court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Id. at 789.

Assuming the surveillance tape was recklessly omitted, as Roberts claims, the remaining issue is whether the omission would have defeated a finding of probable cause. The Court finds that it does not. With respect to probable cause, the dispositive issue is whether the evidence viewed in toto would support Chief Ziolkoski's reasonable suspicion that Roberts threatened A.H., either verbally or physically.[11] In that regard, the tape serves little, if any, exculpatory

---

[11] Neither party submitted the video footage in connection with this motion. The Court attempted to retrieve the footage, however, because the video is in evidence in the Municipal Court proceeding, it is not available.

13

value. As Detective Morante noted, A.H. is not even present in the footage. Moreover, there is no audio recording that accompanies the tape. Therefore, the tape is not probative of whether Roberts verbally threatened A.H. While the tape did not show that Roberts made a threatening gesture, nor did it show, according to Roberts' account, that he was holding a hammer, both Chief Ziolkowski and Detective Morante stated that it was unclear from the surveillance tape whether Roberts was in fact holding a hammer. Notwithstanding those facts, however, the tape does not foreclose the possibility that Roberts did indeed threaten A.H., either verbally or physically. Thus, even if the surveillance tape were included in the affidavit of probable cause, it would not contradict the testimony of the alleged victim and an eye witness, both of whom claimed Roberts threatened to kill A.H. And, as the Court has explained above, a finding of probably cause was sufficiently supported by those witnesses' statements alone. Thus, Roberts' arguments fail.

In addition to Fourth Amendment violations, Roberts further contends that the investigation leading to the determination of probable cause was so inadequate as to violate his substantive due process rights under the Fifth and Fourteenth Amendments. As delineated above, however, probable cause was established as a matter of law at the time Roberts was arrested, and the omission of the surveillance tape could not change that determination. Under those circumstances, Chief Ziolkowski had no further constitutional duty to continue his investigation in an attempt to unearth potentially exculpatory evidence undermining the probable cause determination. See Baker v. McCollan, 443 U.S. 137, 145-46 (1979) (stating that if probable cause is satisfied, "Due Process does not require every conceivable step be taken, at whatever cost, to eliminate the possibility of arresting an innocent person"). Hence, Roberts' Fifth and Fourteenth Amendment rights were not violated in the respects that Roberts claims.

In conclusion, Roberts has not shown that any constitutional violations occurred, much less that the rights allegedly violated were clearly established. Hence, under Saucier, Roberts cannot defeat Chief Ziolkowski's right to qualified immunity, and the Court dismisses Count III and IV of Roberts' Amended Complaint with respect to Chief Ziolkowski.[12]

### 2. The Township and Police Department

Roberts asserts the Township and Police Department violated his rights under both the State and Federal Constitutions. This district has repeatedly interpreted the C.R.A. analogously to § 1983[13]; thus, the Court will only need to proceed under a § 1983 analysis. To succeed on his § 1983 claim, Roberts must demonstrate that the Township and Police Department engaged in some "action pursuant to [an] official municipal policy . . . [that] caused a constitutional tort." Monell v. Department of Social Services, 436 U.S. 658, 691 (1978). Since Monell, the Supreme Court has articulated several ways in which a plaintiff can impose liability on a municipality pursuant to § 1983, including the presence of a policy of inadequate training or supervision, or the existence of a municipal custom. See Connick v. Thompson, 131 S. Ct. 1350, 1354 (2011). However, "it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality." Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997). Rather, the plaintiff must allege a direct causal link between the municipal

---

[12]   The Court notes that as Roberts has failed to establish that Chief Ziolkowski violated any of Plaintiff's rights, any Monell claim against the Township or Police Department stemming from Chief Ziolkowski's actions must fail as well. Nevertheless, the Court will engage in a Monell analysis for Plaintiff's benefit.

[13]   See, e.g., Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 444 (D.N.J. 2011) (holding an analysis under the C.R.A. is analogous to § 1983); Chapman v. New Jersey, No. 08-4130, 2009 U.S. Dist. LEXIS 75720, at 3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart"); Slinger v. New Jersey, 2008 U.S. Dist. LEXIS 71723, at 5 (D.N.J. Sept. 4, 2008) (noting the C.R.A.'s legislative history and using § 1983 jurisprudence as guidance for interpreting the statute).

action and the deprivation of federal rights. Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (holding that a plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the alleged constitutional deprivation).

Under these standards, the Court finds Roberts' allegations of unconstitutional policies and inadequate training to be entirely conclusory. Plaintiff sets forth -- in his opposition brief -- the following allegations to support his Monell claim:

> The [Township] and [Police Department] must also be held accountable for Plaintiff's false arrest and illegal imprisonment, violation of his civil rights, and subsequent malicious prosecution, based on their failure to 1) ensure that the law enforcement officials who they empower to protect, preserve, and safeguard the constitutional, civil and statutory rights of citizens receive the necessary training . . . 2) properly oversee those same law enforcement officials to ensure they seek justice . . . and 3) engage in supervisory practices that would prevent wrongful acts perpetrated by those same law enforcement officials.

(Pl. Br. at 61). These bare allegations are not supported by references to any facts or circumstances comprising the alleged constitutional violations. Indeed, Roberts has failed to identify any particular policy, supervising practice, or standard thereof to support his claims; rather, he merely reiterates, in conclusory terms, the above allegations. Consequently, Roberts' allegations are wholly sufficient to assert Monell liability against the Township and the Police Department. Accordingly, the Court dismisses Counts III and IV of Roberts' Amended Complaint against these defendants.

### III. Conclusion

For the reasons set forth above, the Court finds that Roberts cannot succeed on his claims of false arrest and malicious prosecution as Plaintiff has failed to adhere to the T.C.A.'s notice requirements. In addition, the Court finds the facts alleged cannot support Roberts' claims of constitutional violations under the C.R.A. or § 1983 as against the Township or the Police

Department. Furthermore, Chief Ziolkowski is entitled to qualified immunity. Accordingly, the Court **GRANTS** the Moving Defendants' motion to dismiss, and Plaintiff's claims against them are dismissed.


Dated:  May 3, 2013                                             /s/ Freda L. Wolfson
                                                                                                               Freda L. Wolfson, U.S.D.J.